UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:20-cv-570-MOC-DSC

| | | |
|---|---|---|
| DERRICK COLEMAN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| NORTH CAROLINA DEP'T | ) | |
| OF PUBLIC SAFETY, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**THIS MATTER** comes before the Court on a Motion for Summary Judgment by

Defendants North Carolina Department of Public Safety, Kristie Brayboy, Peter R. Buchholtz,

Byron Burt, Paula Diggs, Kenneth E. Lassiter, Bronnie McLamb, Dana Oliver, Joe Ratley,

Reeco Richardson, Deanise Royal, Azenet Salas, Edward Thomas, and Jessica Ward.[1] (Doc. No.

65). For the following reasons, the Court **GRANTS** Defendants' summary judgment motion and

dismisses this action with prejudice.

I.    **BACKGROUND**

      A.    **PROCEDURAL BACKGROUND**

      On September 9, 2018, Devonte Coleman died while in the custody of the North Carolina

Department of Public Safety after developing a severe fungal infection. Devonte's parents

Derrick and Tangy Coleman (hereinafter "the Colemans") have filed this lawsuit, individually

and as the administrators of Devonte's estate, against the North Carolina Department of Public

_____

[1] Defendants W. David Guice and Erik A. Hooks also joined in the summary judgment motion,
but Plaintiffs have conceded that the claims against them are dismissed.

1

Safety ("NCDPS") and various individual prison officials.

Plaintiffs originally filed this action on September 1, 2020, in Mecklenburg Superior Court, naming five defendants and various John and Jane Does. (Doc. No. 1). On October 16, 2020, Defendants removed the case to this Court. (Id.). On November 25, 2020, four of the original five defendants filed their Answer to the original Complaint. (Doc. No. 5). The other defendant (Ronald Rene) filed a Motion to Dismiss. (Doc. No. 10). Plaintiffs stipulated to the dismissal of Ronald Rene. (Doc. No. 17).

On April 6, 2021, Plaintiffs filed the First Amended Complaint, adding ten defendants. (Doc. No. 21). On April 21, 2021, and July 6, 2021, Defendants filed their respective Answers. (Doc. Nos. 32, 37). On November 10, 2021, Plaintiffs filed their Second Amended Complaint, adding three new defendants. (Doc. No. 42).

Defendants are all NCDPS correctional staff members with the following ranks and assignments: Defendant Lassiter is the former Director of Prisons; Defendant Thomas is the former Warden at Central Prison; Defendant Buccholtz is a Regional Director at NCDPS and former Warden at Morrison; Defendant Brayboy is the current Warden at Morrison; and the remaining Defendants (Burt, Richardson, Royal, McLamb, Ward, Olive, Diggs, Salas, and Ratley) were all Correctional Officers or Correctional Sergeants during the relevant times.

On January 14, 2022, Defendants filed their Answer to the Second Amended Complaint. (Doc. No. 49). Subsequently, Defendant Richardson filed his Answer to the Second Amended Complaint. (Doc. No. 59). The parties have concluded discovery, and Defendants filed the pending summary judgment motion on September 27, 2022. The Court held a hearing on the motion on January 18, 2023.

### B.     FACTUAL BACKGROUND

### i. Devonte Coleman's Underlying Convictions and Prison Infractions

On or about October 6, 2015, Devonte Coleman was convicted of Assault Inflicting Serious Bodily Injury and given a probationary sentence. On April 18, 2017, his probation was revoked, and he was sentenced to one to two years imprisonment. <u>See</u> (Decl. of Counsel at Ex. A (attached as Def. Ex 1)). On the same date, Devonte was also convicted of two counts of Robbery with a Dangerous Weapon and sentenced to approximately two to four years imprisonment. (<u>Id.</u>). Devonte was 22 years old at the time of his 2017 conviction. (Doc. No. 42 ¶¶ 30, 32).

During his incarceration, Devonte was convicted of nine disciplinary infractions. (<u>Id.</u> at Ex. B). At the time of his death, Devonte had pending infractions for Assaulting Person with Weapon and Involvement with Gang. (<u>Id.</u>). Regarding the pending infractions, it was alleged that, on May 17, 2018, Devonte and approximately 19 other inmates "jumped on Inmate Sukkar, punching, stomping, and kicking him in the facial and body areas for approximately 30 seconds... At this time, inmate Norega Watkins [] walked into C&D bathroom and seen his friend, inmate Sukkar, laying on the ground in a fetal position, and went to assist inmate Sukkar, and was immediately jumped on by all the above named inmates, who punched, kicked, and stomped inmate Watkins in the facial and body areas for approximately 30 seconds, until someone alerted that staff was coming." (<u>Id.</u> at Ex. C).

### ii. Devonte Coleman's Medical Conditions and Treatment

On April 27, 2018, Devonte was transferred to Morrison Correctional Institution ("Morrison"). (Def. Ex. 1 at Ex. D). According to Plaintiffs, by around April of 2018, Devonte's parents Derrick Coleman and Tangy Coleman had stopped receiving calls from Devonte and feared that he was not receiving proper care from NCDPS. (Compl. ¶ 34). During this time, the

3

Colemans repeatedly communicated these fears to NCDPS, but NCDPS withheld information regarding Devonte's medical condition and location. (<u>Id.</u> ¶¶ 36–38).

Starting on May 8, 2018, Devonte complained about his face being numb and swollen. (Def. Ex. 1, Ex. E (Bates 90)). On May 16, 2018, an x-ray showed that Devonte had right maxillary sinusitis, and he was scheduled to be seen by a medical provider the following day. (<u>Id.</u> (Bates 76)). The next day, a medical provider examined Devonte and prescribed medications. (<u>Id.</u> (Bates 73–75)).

On May 29, 2018, Devonte complained about facial pain. (<u>Id.</u> (Bates 69–71)). On June 1, 2018, Devonte was taken to Moore Regional Hospital, which conducted multiple tests and ultimately diagnosed Devonte with periorbital cellulitis. (<u>Id.</u> (Bates 581–83)). Devonte was discharged with new medications and instructions to follow-up with ophthalmology and otolaryngology. (<u>Id.</u>). On June 5, 2018, an ophthalmologist examined Devonte and recommended that Devonte see an Ear, Nose, Throat ("ENT") doctor. (<u>Id.</u> (Bates 51–52)).

On June 6, 2018, at Central Prison, an ENT doctor examined Devonte and recommended that Devonte be sent to Rex Hospital for further evaluation. (<u>Id.</u> (Bates 48–49; 37–39)). That evening Devonte was sent to Rex Hospital. (<u>Id.</u> at Ex. D). On June 8, 2018, Rex Hospital diagnosed Devonte with an acute sinus infection and discharged him. (<u>Id.</u> at Ex. E (Bates 26)). However, later that day, the surgeon from Rex Hospital called Central Prison to inform them that Devonte had a fungal infection that would require IV antibiotics. (<u>Id.</u>).

Early the next morning on June 9, 2018, Devonte went back to Rex Hospital, where he stayed until he was transferred to Duke University Medical Center ("Duke Hospital") on June 15, 2018. (<u>Id.</u> at Ex. D (External Movements)). During his hospitalization at Rex Hospital and

4

Duke Hospital, Plaintiffs made the following specific allegations about Defendants[2]:

> Tightened Devonte's shackles – Defendants Burt, Richardson, and Salas (Doc. No. 42 at ¶¶ 61 & 104);

> Discarded Devonte's food when not eaten fast enough – Defendants Royal, Oliver, and Salas (id. ¶ 59);

> Refused to allow the Colemans to touch Devonte – Defendant Diggs (id. at ¶ 54);

> Forced Devonte to urinate in a urinal – Defendant Salas (id. at ¶ 55);

> Failed to preserve Devonte's personal property – Defendants Thomas, Buchholtz, and Brayboy (id. at ¶ 82); and

> Implemented unconstitutional policies – Defendant Lassiter (id. at ¶ 46).

Plaintiffs failed to make any specific allegations about Defendants McLamb, Ward, and Ratley. (Doc. No. 42). Otherwise, Plaintiffs made numerous general allegations against "the Guards"[3] and/or "Defendants." (Id.). On or about June 26, 2018, the Colemans learned that Devonte had undergone four major surgeries and they were allowed finally to see him—though his face was swollen beyond even their recognition. (Compl. ¶¶ 43–44).

On or about July 16, 2018, Plaintiffs' counsel sent a Preservation Letter to Morrison, where Devonte had been housed. (See Ex. A). The letter requested the complete file relating to Devonte's incarceration. (Id.). The letter also requested that Morrison preserve all information

---

[2] Defendants Burt, Royal, McLamb, Ward, Oliver, and Salas (in addition to others) were all deposed, and all denied Plaintiffs' allegations. See (Exs. 12, 14, 15, 16, 17, 18). Furthermore, Defendants Richardson and Ratley submitted Declarations denying Plaintiffs' allegations. See (Exs. 13, 19).

[3] Plaintiff defines the Guards as Defendants Burt, Richardson, Royal, McLamb, Ward Oliver, Diggs, Salas, Tadjou, and Ratley. (Doc. No. 42 at ¶ 20). To differentiate the two groups, the Court will use the term "Supervisory Defendants" to refer to the remaining Defendants (Defendants Lassiter, Thomas, Buchholtz, and Brayboy).

related to the matter including, but not limited to, all audio recordings and phone calls relating to either Devonte Coleman or Derrick Coleman, a complete listing of all correctional officers or NCDPS employees present with Devonte while he was at the hospital, and any photographs or video recordings taken of Devonte or Derrick Coleman. (Id.).

On or about August 24, 2018, the Colemans were informed that Devonte had days or weeks left to live. (Doc. No. 42 ¶ 69). During this time, Defendants denied numerous pleas by the Colemans and counsel for the Plaintiffs to allow compassionate release of Devonte. (Id. ¶¶ 74-78). According to Plaintiffs, Plaintiffs' counsel was forced to obtain a court Order on or about August 27, 2018, permitting Devonte to be released from custody. (Id. ¶ 76; Doc. 1-1, 43–44). According to Plaintiffs, before they were ordered to release Devonte, Defendants subjected Devonte to humiliating, purposeful, and egregious mistreatment, forming the nucleus of Plaintiffs' claims in this action. (Doc. No. 42).

On or about September 13, 2018, Plaintiffs' counsel again notified NCDPS to preserve specific discovery requests that would soon be issued in the matter. (Doc. No. 1-1, 45–46). These requests included the names of employees at Morrison who fielded Derrick Coleman's phone calls regarding Devonte, the audio recordings of all such calls, and the names of all employees that were in the hospital room with Devonte. (Id.).

Devonte Coleman died on or about September 9, 2018. (Doc. No. 42 ¶ 78). Immediately after Devonte's death, Derrick Coleman requested the return of his son's belongings and letters that were addressed specifically to the Colemans. (Id. ¶ 79). Despite numerous phone calls and requests from the Colemans, Defendants allegedly could not locate Devonte's personal property or provide any more information. (Id. ¶ 81).

In the Second Amended Complaint, Plaintiffs allege the following claims against the

6

various Defendants: (1) Eighth Amendment claim based on medical deliberate indifference under 42 U.S.C. § 1983 (against all defendants) (Count 1); (2) Eighth Amendment claim based on conditions of confinement under 42 U.S.C. § 1983 (against all defendants) (Count 2); (3) a repetitive Eighth Amendment claim based on deliberate indifference and/or conditions of confinement under 42 U.S.C. § 1983 (against all individual defendants, but not NCDPS) (Count 3); (4) a North Carolina state law claim for negligence (against all defendants) (Count 4); (5) a violation of the North Carolina Constitution (against all defendants) (Count 5); (6) a North Carolina state law claim of conversion (against all defendants) (Count 6); (7) a North Carolina state law claim of intentional infliction of emotional distress (against all defendants) (Count 7); (8) a North Carolina state law claim for punitive damages (against all defendants) (Count 8); and (9) a North Carolina state law claim for obstruction of justice (against all defendants) (Count 9). (Id.).

## II.    STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

7

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S. Ct. 2658, 2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## III. DISCUSSION

### A. Defendants' Exhaustion Argument

Defendants first argue that the claims brought by Devonte's Estate, related only to Devonte, should be dismissed for failure to exhaust his administrative remedies before filing his Complaint as required by the PLRA. This Court disagrees.

The PLRA provides that "no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. 1997e(a). Defendants contend that, under Section 1997e(a), Devonte was

required, and failed to, exhaust his administrative remedies.[4] However, this is a lawsuit brought by Devonte's estate. Facing similar facts, at least one other district court has held that "[b]ecause an estate cannot be imprisoned or accused, convicted, or sentenced for a criminal violation, it is not, thus, a prisoner under the PLRA" and therefore was not required to exhaust administrative remedies. Torres Rios v. Pereira Castillo, 545 F. Supp. 2d 204, 206 (D.P.R. 2007) (where a mother filed a complaint on behalf of her son, who died while a prison inmate, finding that neither the mother nor the estate was subject to the PLRA exhaustion requirement).

The purpose of the PLRA supports this position as well. The legislation was passed to manage a significant increase in frivolous litigation in the federal court system by prisoners, not litigation by prisoners' estates. Doe v. Wash. Cnty., 150 F.3d 920, 924 (8th Cir.1998) ("The PLRA was designed to discourage the initiation of litigation by a certain class of individuals— prisoners—that is otherwise motivated to bring frivolous complaints as a means of gaining a short sabbatical in the nearest Federal courthouse." (internal quotation marks omitted)). It stands to reason that, given the intention of the PLRA, its exhaustion requirement should not apply to an estate.

Moreover, because the exhaustion requirement only applies to "individuals who are imprisoned the time the suit is filed," the exhaustion requirement ceased to apply to Devonte the day he was released from prison. Rivera-Quiñones v. Rivera-Gonzales, 397 F. Supp. 2d 334, 340 (D.P.R. 2005) (finding that the PLRA exhaustion requirement did not apply to the plaintiff relatives, where relatives of an inmate who died while incarcerated filed Section 1983 action for failure to protect the inmate from attacks).

---

[4] It is undisputed that from June 1, 2017 (before Devonte's hospitalization) through September 23, 2020 (after Devonte's death), Devonte did not exhaust any grievances. (Def. Ex. 1 at Ex. I).

9

Alternatively, the Court agrees with Plaintiffs that Devonte's severe illness prevented Devonte from filing any written grievance concerning his treatment during the relevant period before his death. "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." Moore v. Bennett, 517 F.3d 717, 725 (4th Cir. 2008). It is undisputed that Devonte was terminally ill and hospitalized during the period relevant to this lawsuit. Further, there is no evidence that grievance paperwork was made available to Devonte during Devonte's hospitalization. As such, it appears that Devonte was prevented both by his terminal illness and by the failure of NCDPS to provide any avenue to seek administrative remedies by filing a written grievance during his stay in the hospital. To the extent that emergency grievances were available to Devonte while he was undergoing urgent medical care, he exhausted such remedies. Guards admitted that Devonte managed to complain directly to them about his conditions of confinement during his stay in the hospital. (Pls. Ex. B. Royal Dep. 57:1–22). Thus, because Devonte needed urgent medical care and presented his grievances to the custodial staff assigned to his room, he complied with the NCDPS Emergency Grievances administrative protocol. For all these reasons, the Court finds that Plaintiffs' claims are not barred by failure to exhaust administrative remedies.

**B.  Plaintiffs' Claims against NCDPS**

The Court first addresses Defendants' summary judgment motion as to Defendant NCDPS. Here, Plaintiffs' Claims 1-3 purport to allege Eighth Amendment violations against NCDPS based on conditions of confinement and deliberate indifference to serious medical needs, pursuant to 42 U.S.C. § 1983. Plaintiffs also bring North Carolina state law claims against NCDPS for negligence (Claim 4), a violation of the North Carolina state constitution (Claim 5), conversion (Claim 6), IIED (Claim 7), punitive damages (Claim 8), and Obstruction of Justice

10

(Claim 9).

First, as to Plaintiffs' Section 1983 claims against NCDPS, Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…

NCDPS is considered an arm of the State of North Carolina and therefore enjoys immunity from a suit for monetary damages in a Section 1983 action based on the Eleventh Amendment of the U.S. Constitution. Savage v. North Carolina Dep't of Corr., No. 5:06-CV-171-FL, 2007 WL 2904182, at *5 (E.D.N.C. Sept. 29, 2007). Moreover, Section 1983 actions are limited to "persons" who violated a plaintiff's rights as protected by federal law. NCDPS is not a person within the meaning of that statute. Karrick v. N.C. Dep't of Pub. Safety, No. 1:14-cv-82, 2015 WL 4756963, at *3 (W.D.N.C. Aug. 12, 2015) (citing Savage, 2007 WL 2904182, at *5). Therefore, Plaintiff's Section 1983 Eighth Amendment claims against NCDPS must be dismissed.[5]

As for Plaintiffs' state law claims, the North Carolina Industrial Commission is a plaintiff's sole remedy for negligence claims against the state of North Carolina and its agencies. See Stewart v. North Carolina, 393 F.3d 484, 490 n.3 (4th Cir. 2005) (noting that, as to negligence claims, North Carolina has vested exclusive jurisdiction in the North Carolina

---

[5] In response to Defendants' summary judgment motion, Plaintiffs do not dispute that NCDPS is entitled to Eleventh Amendment sovereign immunity as to Claims One, Two, and Three. Because Plaintiffs have not challenged this argument in response to the summary judgment motion, they have abandoned these claims. See Gibbs v. Smitherman, 2012 WL 6093805, at *8 (E.D.N.C. Dec. 7, 2012) (stating that failing to oppose a movant's argument in a brief on summary judgment implicitly concedes the argument).

11

Industrial Commission). Thus, the negligence claim (Claim 5) against NCDPS must be dismissed.

Next, because the torts of conversion, obstruction of justice, and intentional infliction of emotional distress (Claims 6, 7, and 9) are all intentional torts, Plaintiffs' claims against NCDPS are all barred by the doctrine of sovereign immunity.[6] Kawai Amer. Corp. v. Univ. of N.C. Chapel Hill, 152 N.C. App. 163, 167 (2002) (conversion); See Hawkins v. State, 117 N.C. App. 615, 628–29 (1995) (intentional infliction of emotional distress); McCarthy v. Scofield, No. 284129, 2009 WL 3235639, at *5 (Mich. App. Oct. 8, 2009) (obstruction of justice).[7]

Next, as to the North Carolina Constitution Claim (Claim 5), Plaintiffs claim that Devonte did not have an adequate state remedy. However, Plaintiffs do not dispute that they have pending claims with the North Carolina Industrial Commission. Thus, they have an adequate state remedy. See Taylor v. Wake Cnty., 258 N.C. App. 178, 191 (2018). Therefore, the North Carolina Constitution Claim must also be dismissed against NCDPS.[8]

---

[6] In response to Defendants' summary judgment motion, Plaintiffs do not dispute that the Industrial Commission is Plaintiffs' sole remedy for their negligence claims (Claim 4). Furthermore, Plaintiffs do not dispute that their claims for Conversion (Claim 6), IIED (Claim 7), and Obstruction of Justice (Claim 9) are intentional torts, which are also barred by sovereign immunity.

[7] Defendants note that while North Carolina courts have not explicitly stated that obstruction of justice is an intentional tort, other courts have held as such.

[8] Moreover, Plaintiffs claim for the first time that NCDPS waived its immunity as to Plaintiff' state constitutional claims by purchasing liability insurance. (Doc. No. 74 at 5). However, Plaintiffs failed to plead such a waiver in their Amended Complaint. See (Doc. No. 42). "Sovereign immunity is not merely a defense to a cause of action; it is a bar to actions that require a plaintiff to establish a waiver of immunity. Thus, the trial court must determine whether the complaint specifically alleges a waiver of governmental immunity. Absent such an allegation, the complaint fails to state a cause of action." Can Am S., LLC v. State, 234 N.C. App. 119, 125 (2014) (internal citations and quotations omitted). Because Plaintiffs did not allege a waiver in their amended complaint, they cannot do so now. Lastly, contrary to Plaintiffs' argument, NCDPS did not lose its immunity by removing this case to federal court. See Passaro v. Virginia, 935 F.3d 243, 247 (4th Cir. 2019).

12

Finally, because all of the substantive claims against NCDPS are being dismissed, the claim for punitive damages (Claim 8) must also be dismissed. See Hawkins v. Hawkins, 101 N.C. App. 529, 532 (1991).

In sum, for the reasons stated herein, all of Plaintiffs' claims against NCDPS must be dismissed.

### C. Plaintiffs' Claims against the Individual Defendants

In Claims 1-3, Plaintiffs brings Eighth Amendment claims against the individual Defendants under Section 1983 based on conditions of confinement and deliberate indifference to serious medical needs. Plaintiffs also bring North Carolina state law claims against the individual defendants for negligence (Claim 4), conversion (Claim 6), IIED (Claim 7), and Obstruction of Justice (Claim 9). As the Court will discuss, infra, Plaintiffs seek to impose liability on certain NCDPS correctional officers who were standing guard over Devonte in the hospital based on their own personal liability. Plaintiffs also seek to impose liability on certain NCDPS supervisors based on their supervisory liability. The Defendant Guards are Defendants Richardson, McLamb, Burt, Oliver, Royal, Ward, Diggs, and Salas. The Defendant Supervisors are Defendants Tadjou, Ratley, Thomas, Buchholtz, Brayboy, and Lassiter. (Id.). The individual Defendants seek summary judgment on the Eighth Amendment claims, and they have raised the defense of qualified immunity.

### i. Plaintiffs' Eighth Amendment Claims against the Defendant Guards and the Supervisory Guards Named Individually

The Eighth Amendment protects prisoners from "unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 102 (1976). To show an Eighth Amendment violation, Plaintiffs must show both (1) a serious deprivation of a basic human need, an objective standard;

and (2) deliberate indifference to prison conditions on the part of prison officials, a subjective standard. See Williams v. Griffin, 952 F.2d 820, 824 (4th Cir. 1991). Here, Plaintiffs' Eighth Amendment claims are based on their claims that Defendants were deliberately indifferent to Devonte's serious medical needs and that Defendants subjected Devonte to conditions of confinement that amounted to a deprivation of his based human needs. The Court will address each in turn.

 **a. Eighth Amendment Violation Based on Deliberate Indifference to Serious Medical Needs**

 Deliberate indifference to an inmate's serious medical needs or a substantial risk of harm constitutes unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. Estelle, 429 U.S. at 104. Deliberate indifference requires that a defendant prison official knew of and purposefully ignored "an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 837 (1994). The official must both be aware of facts from which the inference could be drawn that an objectively serious condition, medical condition, or risk of harm exists, and he must also draw the inference. Id.

 Here, the Court finds that Plaintiffs have not raised a genuine issue of disputed material fact on summary judgment as to whether the individual Defendants were deliberately indifferent to Devonte's serious medical needs before he died. First, it is undisputed that Devonte was under the medical care of hospital staff while he was being treated for his fungal infection. None of the named Defendants are medical staff—they are all NCDPS correctional officers or supervisors. Under well-established Fourth Circuit law, correctional staff are not responsible for medical care when an inmate is in the care of medical staff. See Iko v. Shreve, 535 F.3d 225, 242 (4th Cir. 2008).

Moreover, the time period relevant to Plaintiffs' claims relate to Devonte's time hospitalized at two of North Carolina's top hospital – Duke and UNC Rex. It is undisputed that Defendants were not responsible for the administration of Devonte's medication and/or his medical care when he was under the medical supervision of professional medical staff. In fact, the hospital logs and records show that Devonte was constantly being seen by medical professionals, and his medication was given to him by medical staff (not correctional staff). (Def. Ex. 1 at Ex. F).

Finally, Plaintiffs have not presented any medical records to show how Devonte failed to receive adequate medical care. Defendants are entitled to summary judgment as to Plaintiffs' Eighth Amendment claim to the extent it is based on deliberate indifference to serious medical needs.[9]

### b.  Eighth Amendment Violation Based on Conditions of Confinement

Next, the Court must determine whether Plaintiffs have raised a genuine issue of disputed material fact as to whether Defendants subjected Devonte to conditions of confinement while in the hospital that resulted in a serious deprivation of his basic human needs, violating his Eighth Amendment rights.

"The Eighth Amendment's prohibition on cruel and unusual punishments imposes certain basic duties on prison officials.... includ[ing] maintaining humane conditions of confinement." Raynor v. Pugh, 817 F.3d 123, 127 (4th Cir. 2016) (citation and internal quotation marks

---

[9] Plaintiffs have not made any substantive attempts to rebut Defendants' arguments regarding the deliberate indifference to serious medical needs claim. Indeed, the substance of Plaintiffs' arguments on summary judgment and at oral argument have been directed to Plaintiffs' claim that the hospital guards subjected Devonte to intolerable conditions of confinement that, when considered cumulatively, violated his Eighth Amendment rights.

omitted). For an inmate to prove an Eighth Amendment conditions of confinement claim, he must "show both (1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials." Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993). To prove an Eighth Amendment claim, not only must an inmate have suffered a serious deprivation, but he must also show "a serious or significant physical or emotional injury resulting from the challenged conditions, or substantial risk thereof." De'lonta v. Johnson, 708 F.3d 520, 525 (4th Cir. 2013) (internal quotation marks omitted); see also Shako v. Smith, 71 F.3d 162, 167 (4th Cir. 1995). Inmates are not "guest[s] in a hotel, and it should be expected that conditions in such a setting are often times less than ideal." Daniels v. Benston, No. 5:13CT3286-FL, 2016 WL 270218, at *6 (E.D.N.C. Jan. 21, 2016) (citing Bell v. Wolfish, 441 U.S. 520, 537 (1979).

Here, Plaintiffs contend that various NCDPS policies or regulations, as applied to Devonte, cumulatively, amounted to a violation of his Eighth Amendment rights because they subjected him to intolerable conditions of confinement. "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89 (1987). "Such a standard is necessary if prison administrators…, and not the courts, are to make the difficult judgment concerning institutional operations." Id. (internal citations and quotations omitted). The Supreme Court uses a four-factor test to determine whether the regulation is reasonably related to a legitimate penological interest: (1) whether there is "a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on

16

the allocation of prison resources generally"; and (4) whether there are "ready alternatives." Id. at 89–90.

In response to summary judgment, Plaintiffs argue that they have established evidence raising a genuine dispute of fact as to whether Defendants deprived Devonte of the following identifiable human needs: social interaction, environmental stimulation, mental health, sleep, nutrition, and exercise.[10] Plaintiffs have presented evidence, and it is undisputed, that NCDPS imposed various restrictions on Devonte while he was in the hospital, despite that he was terminally ill. That is, Devonte was not allowed to go outside of the hospital; guards took away his food if he took too long to eat it; he was not allowed to exercise outside; he was not allowed to hug, kiss, or have any other direct contact with his loved ones, even after his family knew his condition was terminal; he was not allowed to have any outside food because it is considered "contraband"; he was required to eat alone, shackled to his bed; he was required to urinate while shackled to the bed; and he was required to sleep shackled. Plaintiffs point out that at no point during his 3-month hospital stay was Devonte allowed to remove his shackles. Plaintiffs also note that Devonte was also denied the ability to see his children despite his terminal condition and despite physician requests for such visitation.

The above noted limitations that were imposed on Devonte were all policies of NCDPS. In addition, Plaintiffs also contend that the guards harassed Devonte by blaring in-room televisions, preventing Devonte from receiving necessary rest. Plaintiffs also claim, through affidavits submitted by the Colemans, that the Defendant Guards regularly and unnecessarily

_____

[10] Plaintiffs alleged in their Amended Complaint that Devonte was also denied use of prescribed medical gum, but Defendants argue that there was no prescription for medical gum, and Plaintiffs have not attempted to rebut this assertion on summary judgment.

17

tightened Devonte's shackles and forced him to urinate in front of family members instead of allowing him to use the in-room restroom.

Here, the limitations placed on Devonte while he was in the hospital that were based on NCDPS's policies and regulations were all based on legitimate penological interests, and the Court finds that, even considered cumulatively, these conditions did not deprive Devonte of his Eighth Amendment rights. First, courts have found that each limitation is constitutional when applied to hospital inmates. As to the refusal to allow Devonte to eat outside food because it was considered contraband, inmates are not entitled to the food of their choice. See, e.g., Robbins v. Robertson, 782 Fed. Appx. 794, 805 (11th Cir. 2019) (holding that the Eighth Amendment does not require "prison officials to indulge inmates' dietary preferences"); Jones v. Diamond, 636 F.2d 1364, 1378 (5th Cir. 1981) (holding that inmate's diet of starch and carbohydrates with few vegetables and fruits is not a constitutional violation); Flores v. Moser, No. 16-cv-1860, 2019 WL 2016789, at *7 (D. Minn. Jan. 7, 2019) (holding that an inmate's inability to order certain food items was not a constitutional violation); Farrow v. Stanley, No. 02-567, 2004 WL 224602, at *7 (D.N.H. Feb. 5, 2004) (holding that denying inmates outside food was not a constitutional violation).

Next, as to Plaintiffs' evidence that the guards would take away food if Devonte did not eat it within a certain amount of time, courts have held that only giving inmates a limited time to eat their meals is not a constitutional violation. See, e.g., Schrader v. Collins, No. 97-4471, 1998 WL 863427, at *2 (6th Cir. 1998) (summary judgment affirmed for inmate claims regarding hurried meals of five minutes); Taylor v. Torok, No. 1:21cv779, 2021 WL 6143635, at *8 (W.D. Mich. Dec. 30, 2021) (dismissing on frivolity review claims that inmate given less than five minutes to eat); Taylor v. Crews, No. 4:14cv98, 2015 WL 5042721, at **6–7 (N.D. Fl. July 27,

18

2015) (dismissing claims that inmate was only given 4–8 minutes to eat). Furthermore, while Plaintiffs alleged that Defendants Royal, Salas, and Oliver "regularly discarded Devonte's food if he failed to finish it fast enough" (Doc. No. 42 at ¶ 59), Derrick Coleman admitted that during the months of June and July they only saw Devonte once a week. (Def. Ex. 2 at 125:3:126:14). At most, Plaintiffs have presented evidence that Devonte was denied sufficient time to finish his meals once a week. The severity of the risk of missing one meal a week (or even three meals a week) does not rise to a constitutional violation.

As for the requirement that Devonte had to relieve himself through a urinal, courts have held that an inmate's use of a medical urinal, bottle/cup, or catheter is not a constitutional violation. See, e.g., Qawi v. Howard, No. Civ. 98-220-GMS, 2000 WL 1010281, at *2 (D. Del. July 7, 2000) (no constitutional violation where an inmate was forced to urinate in a drinking glass during a prison lockdown). Furthermore, a mere delay in allowing an inmate to a toilet is not a constitutional violation. See Revels v. Vincenz, 382 F.3d 870, 875 (8th Cir. 2004); Garcia v. Garcia, 2018 WL 11257395, at *4 (E.D. Cal. May 31, 2018) (collecting cases).

Here, Plaintiffs alleged that Devonte was forced "on one occasion" to wait more than 20 minutes to relieve bodily functions (Doc. No. 1 at ¶ 56) and forced "on more than one occasion, in the presence of other guards, to pull a bed sheet over his body to urinate in a cup while remaining shackled to the bed." (id. at ¶ 55). While Devonte was given a portable medical urinal, this did not deny him the ability to urinate. Furthermore, the fact that Devonte had to wait more than 20 minutes to go to the bathroom does not deny him the ability to relieve himself.

As for the hospital requiring Devonte to remain shackled to his bed during his entire stay, restraining a hospitalized inmate to his bed does not amount to a constitutional violation. Holloman v. Kiser, No. 7:20cv115, 2021 WL 1215855, at **4–5 (W.D. Va. Mar. 31, 2021)

(finding no constitutional violation where the inmate was in a hospital for 50 hours in full-body restraints); Adams v. Kirby, No. 1:06cv1484, 2007 WL 963304, at *6 (E.D. Cal. Mar. 29, 2007) (finding an inmate's claim frivolous because "restraining plaintiff in his bed are to be expected given that plaintiff was in custody and outside of prison walls"); Boyd v. Alameda Cnty., No. Civ. 02-461 SI, 2005 WL 2171870, at **5–7 (N.D. Cal. Sept. 6, 2005) (finding that an inmate being "handcuffed to a bed 24/7 for 17 days" was not a constitutional violation). Plaintiffs have not shown that being restrained to his bed imposed a severe risk of harm to Devonte. This is especially true considering that Devonte's restraints were removed, and he was given the opportunity to exercise by walking around the hospital. Furthermore, Devonte would have similarly been removed from the bed when he was undergoing treatment in the hyperbaric chamber, a treatment he routinely received according to the hospital logs. (See generally, Def. Ex. 1 at Ex. F).

Second, there are legitimate penological interests in restraining a hospitalized inmate to his bed. NCDPS has a legitimate penological interest in protecting the correctional staff, hospital staff, and the general public from inmates, especially known violent inmates.[11] Furthermore, NCDPS has a legitimate penological interest in preventing the escape of inmates, especially known violent inmates. Thus, guarding hospitalized inmates and ensuring that they are restrained to the bed at all times reduces the risk of both escape and assault.

Regarding Plaintiffs' allegation that Devonte was denied exercise, it is undisputed that Devonte regularly walked throughout the facility, and he exercised regularly. Plaintiffs contend

---

[11] Moreover, Rex Hospital has an internal policy that requires hospitalized inmates to be restrained at all times. See (Decl. of Arthur Campbell at Ex. A (Ex. 9)). Thus, even if Defendants wanted to remove the restraints, they could not do so under hospital policies.

that Devonte should have been allowed to walk outside the facility, but Defendants contend that the facility's Lieutenant (not any of the named Defendants) would have had authority to allow Devonte to walk outside. In any event, as a hospital inmate Devonte had no constitutional right to walk outside.

As for Plaintiffs' contention that Devonte was not allowed to see his children while in the hospital and was denied other visitors, "[n]either the United States Supreme Court nor the Fourth Circuit has recognized a constitutional right to prison visitation." Void v. Thacker, No. 7:17-cv-249, 2018 WL 4704067, at *5 (W.D. Va. Sept. 30, 2018) (citing Overton v. Bazzetta, 539 U.S. 126 (2003); Williams v. Ozmint, 716 F.3d 801, 807–08 (4th Cir. 2013); White v. Keller, 438 F. Supp. 110, 115 (D. Md. 1977), aff'd, 588 F.2d 913 (4th Cir. 1978)). Thus, while depriving a dying inmate of seeing his children may be callous, since Devonte had no constitutional right to visitation (much less contact visitation), NCDPS' policies did not infringe on Devonte's constitutional rights.

Finally, as to Plaintiffs' contention that the guards kept Devonte's restraints too tight Plaintiffs have presented no evidence to show that the restraints were overtightened or that, even if they were overtightened, they posed a severe risk of harm and/or result in any injuries that were sufficiently serious. As for Plaintiffs' allegations that the guards intentionally blared the television to harass Devonte, Plaintiffs have produced no evidence that Devonte was subject to constant noise. Even assuming that the guards, at times, left the television blaring, this does not amount to a constitutional violation.

In sum, for the reasons stated herein, the limitations imposed on Devonte did not violate his constitutional rights, and each limitation was based on legitimate penological interests. Thus, even considered cumulatively, the limitations on Devonte did not create such intolerable

21

conditions as to rise to an Eighth Amendment violation.

The Court further notes that, even if Plaintiffs could raise a genuine issue of fact as to this first prong of an Eighth Amendment violation, to proceed on his claims, Devonte must prove that the challenged inhumane conditions caused "serious medical and emotional deterioration." Strickler, 989 F.2d at 1379–80. That is, Plaintiffs' theory is that the alleged inhumane restrictions placed on Devonte caused him to deteriorate emotionally and physically. Plaintiffs appear to suggest that, had Devonte been treated better, his physical state would not have deteriorated as rapidly. Generally, proximate cause is an issue of fact for the jury. See Olds v. U.S., No. 10-6683, 2012 WL 1130604, at *2 (4th Cir. Apr. 5, 2012). However, "[i]n cases involving 'complicated medical questions far removed from the ordinary experience and knowledge of laymen, only an expert can give competent opinion evidence as to the cause of an injury.'" Phillip v. GEO Grp., Inc., No. 5:09-CT-3115-FL, 2012 WL 5392120, at *6 (E.D.N.C. Nov. 5, 2012), aff'd, 520 Fed. Appx. 215 (4th Cir. 2013); Edwards v. Graham Cnty. Jail, No. 1:16-cv-315-FDW, 2017 WL 5894496, at *6 (W.D.N.C. Nov. 29, 2017). "[W]hen an injury lacks an obvious origin and multiple causes are possible, expert medical testimony is necessary to prove causation." Zartner v. Miller, 760 Fed. Appx. 558, 563–64 (10th Cir. 2019); Miller v. Mandrin Homes, Ltd., 305 Fed. Appx. 976, 980 (4th Cir. 2009) ("The Millers also produced no evidence of medical causation…In short, the Millers have suggested only possibility, rather than probability, on an essential element to their claims. The district court properly granted summary judgment.").

Here, it is undisputed that Devonte was diagnosed with a fungal infection to his sinuses. Furthermore, it is undisputed that he had to have multiple surgeries to his sinuses/face/eye. And lastly, it is undisputed that Devonte was taking a litany of prescription drugs. Eye and brain

22

injuries are "highly complex" injuries and therefore require expert testimony. Earle v. U.S., No. 6:13-cv-184, 2016 WL 8814363, at *6 (E.D. Ky. Feb. 8, 2016), recommendation adopted, 2016 WL 1417811 (E.D. Ky. Apr. 11, 2016). Plaintiffs have produced no evidence showing that Devonte's conditions of confinement caused his symptoms and/or side effects – whether it was the conditions of confinement or his fungal infection and/or prescriptions.

Next, even if Plaintiffs could raise a genuine issue of disputed material fact as to whether Devonte was exposed to unconstitutional conditions of confinement, Plaintiffs have failed to present evidence of the second prong, which requires them to show that Defendants actually knew of, and disregarded, a substantial risk to Devonte's health or safety. See Rish v. Johnson, 131 F.3d 1092, 1096 (4th Cir. 1997). Here, it is undisputed that NCDPS policies required the Defendant Guards to impose most of the conditions for which Plaintiffs complained. For example, NCDPS required that hospitalized inmates be guarded, be restrained to the bed, not receive outside food, and not have contact visits. Since the Guards were following NCDPS policy, they cannot be said to have imposed a substantial risk to Devonte's health or safety. To the contrary, as noted above, these restrictions were imposed for legitimate penological purposes.

In sum, the Court finds that Plaintiffs have failed to raise a genuine issue of disputed fact as to whether the Defendant Guards violated Devonte's Eighth Amendment rights. Plaintiffs insist, however, that, given Devonte's obviously severe and fatal illness, NCDPS's policies, taken as a whole, deprived Devonte of certain human needs in violation of his Eighth Amendment rights. Plaintiffs argue that Defendants' imposition of its customs, policies, procedures, and actions were an "exaggerated response" to prison concerns and thus not rationally related to a legitimate penological interest, but instead were intended to harass, humiliate, and embarrass Devonte. The Court cannot agree. Here, there is no doubt that Devonte

23

tragically lost his life at a young age due to a rare viral infection. Of course, the Colemans reasonably would have preferred for their child to have a better quality of life at the end of his life. However, Devonte was an inmate who had been convicted of a violent crime. As a hospital inmate, he was subject to certain limitations based on reasonable penological interest.

Furthermore, while Devonte was no doubt seriously ill during his hospital stay, he was still well enough to walk around on his own, eat on his own, and use the bathroom on his own. This means he was potentially strong enough to fight or use force while in the hospital, and Plaintiffs have produced no evidence to the contrary. For the protection of the public, the correctional staff, and the hospital staff, NCDPS implemented policies to have hospitalized inmates restrained to their bed, guarded, denied physical contact by non-medical personnel, and denied contraband (including outside food). These are sound policies furthering NCDPS' legitimate penological purposes to prevent escape, prevent introduction of contraband, and protect the public and staff. Devonte's terminal condition did not relieve NCDPS of its obligation to take measures to protect hospital staff and patients during his stay.

Moreover, Devonte was given medical care by some of the best providers in the state, given the same food as other hospital patients, given exercise opportunities inside the hospital, and given visitation with his family. In imposing restrictions on hospital inmates, NCDPS was simply following its duty to protect the general public, including the hospital staff. NCDPS was also following hospital policies. While the cumulative effect of Devonte's conditions of confinement was less than ideal, it does not amount to a constitutional violation.

In sum, the court finds that the individual guards are entitled to summary judgment as to Plaintiffs' Eighth Amendment claim against them based on conditions of confinement. It follows that, because the individual Defendant Guards are not liable, there can also be no supervisory

24

liability as to the Supervisory Defendants.

### c. Qualified Immunity

The individual Defendants have also raised the defense of qualified immunity. For the reasons already stated, the Court finds no constitutional violation in the first instance. In any event, even if a constitutional violation did occur, Defendants are nonetheless entitled to qualified immunity. Qualified immunity shields "government officials performing discretionary functions…from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The inquiry into whether a right is clearly established must "be undertaken in light of the specific context of the case" and "not as a broad general proposition. . . ." Saucier v. Katz, 533 U.S. 194, 201 (2001). Such a right is "clearly established" for qualified immunity purposes by decisions of the U.S. Supreme Court, Fourth Circuit Court of Appeals, or the highest court of the state where the case arose. Wilson v. Layne, 141 F.3d 111, 114 (4th Cir. 1998) (en banc). This inquiry is limited to the law at the time of the incident, as "an official could not be reasonably expected to anticipate subsequent legal developments." Harlow, 457 U.S. at 818.

Here, even if the Defendant Guards violated Devonte's Eighth Amendment rights, such rights were not clearly established at the time of Defendants' actions. Devonte did not have a clearly established constitutional right against such conditions. For example, regarding his nutrition, it was not clearly established Devonte had a constitutional right to outside food or to a certain timeframe in which to eat his meals; regarding the guards and restraints, it was not clearly established that Devonte had a constitutional right to not be guarded and restrained while hospitalized outside the prison; regarding the visitation, it was not clearly established that

25

Devonte had a constitutional right to visitation, much less contact visits. Furthermore, there were established NCDPS policies that required the guards to impose these conditions. Additionally, Plaintiffs have presented no case law showing that the combination of all the alleged inhumane conditions amounted to an Eighth Amendment violation under clearly established law. In sum, since none of these alleged constitutional rights were clearly established at the time of Defendants' actions, the individual Defendants are entitled to qualified immunity as to Plaintiffs' Eighth Amendment claims against them.

**ii.** **Plaintiffs' North Carolina State Law Claims against the Individual Defendants (Negligence, Conversion, Obstruction of Justice, Intentional Infliction of Emotional Distress, and the North Carolina State Constitutional Claims)**

As noted, Plaintiffs bring various North Carolina state law claims against Defendants, including claims for negligence, conversion, obstruction of justice, intentional infliction of emotional distress, and a claim under the North Carolina State Constitution. Defendants seek summary judgment as to all of Plaintiffs' state law claim, and they also raise public official immunity as an affirmative defense.

**a. Plaintiffs' Claim for Negligence**

"The common law claim of negligence has three elements: (1) a legal duty owed by the defendant to the plaintiff, (2) a breach of that legal duty, and (3) injury proximately caused by the breach." <u>Keith v. Health-Pro Home Care Servs., Inc.</u>, 381 N.C. 442, 450 (2022). Plaintiffs claim numerous alleged breaches of duty, generally grouped into three categories: (1) medical care before Devonte's hospitalization; (2) conditions of confinement while Devonte was hospitalized; and (3) medical care while Devonte was hospitalized. (Doc. No. 42 at ¶ 110).

26

### i. Medical Care Before Hospitalization

Regarding the first category (medical care before hospitalization), as the Court has already discussed, Plaintiffs did not sue any of the medical personnel actually responsible for Devonte's medical care at Morrison and/or Central Prison, before his hospitalization. To the contrary, Plaintiffs only sued NCDPS and correctional staff members. However, NCDPS policies clearly state that "[c]linical matters involving medical, nursing, mental health and dental judgments are the sole province of licensed health care providers." (Ex. 1 at Ex. G (E.0207)). Thus, correctional staff members are not authorized to triage, diagnose, and/or treat inmates, and only owed a duty to provide Devonte access to medical professionals.

The medical records show that it is undisputed that Devonte was provided access to medical professionals. Furthermore, while proximate cause is generally an issue of fact for the jury, cases involving complex medical questions required expert testimony. See Gaines v. Cumberland Cnty. Hosp. Sys., Inc., 203 N.C. App. 213, 219 (2010) (proximate cause issue of fact for the jury); Zbytniuk v. ABF Freight Sys., Inc., 173 N.C. App. 236 (2005) (table). Thus, even if the Court were to find that Defendants owed Devonte some greater duty, Plaintiffs have failed to present any type of expert testimony to prove that Defendants' actions caused Devonte's injuries. Therefore, Defendants are entitled to summary judgment for this first category of claims.

### ii. Conditions of Confinement While Hospitalized

As noted above, Devonte did not have a constitutional right to the conditions of confinement for which Plaintiffs now advocate. Furthermore, there is no other statutory right that would have provided for his desired conditions of confinement. Therefore, Defendants did not owe Devonte a duty to provide his desired conditions of confinement. Furthermore, even if the

Court were to find that Defendants owed Devonte a duty to provide his desired conditions of confinement, Plaintiffs have failed to present evidence to show that Defendants alleged breach of that duty caused Devonte any harm.

### iii. Medical Care While Hospitalized

Again, as noted above, Plaintiffs did not sue of the medical personnel that were responsible for Devonte's treatment. Instead, they only sued the correctional staff. As discussed above, Defendants were not authorized to triage, diagnose, or treat Devonte while he was hospitalized. Instead, Devonte's medical care while hospitalized was left to the medical professionals at Rex Hospital and Duke Hospital. Therefore, Defendants neither owed Devonte a duty of care nor breached that duty of care.[12] In sum, Defendants are entitled summary judgment on Devonte's negligence claim.

### b. Plaintiffs' Claim for Conversion

Next, as to Plaintiffs' claim for conversion, "[t]here are, in effect, two essential elements of a conversion claim: ownership in the plaintiff and wrongful possession or conversion by the defendant." Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC, 365 N.C. 520, 523 (2012). Furthermore, conversion is an intentional tort, requiring intent. Kawai Am. Corp., 152 N.C. App. at 167.

Here, at the hearing on Defendants' summary judgment motion, Defendants conceded that Devonte's personal property went missing at some point, most likely during his transfer from Morrison to Central Prison.[13] Defendants could provide no explanation or defense for the

---

[12] Even if the Court were to find that Defendants owed him a duty of care and breached that duty of care, Plaintiffs still cannot prove causation because Plaintiffs did not retain a medical expert.
[13] Defense counsel explained that prison officials likely put in a transfer to Central Prison because it was closer to Duke Hospital and Rex Hospital, where Devonte was being treated.

fact that Devonte's personal possessions went missing. To be sure, at some point, someone who had possession over Devonte's property did <u>something</u> with it. It was clearly within the custody of NCDPS at one time, and now it is apparently gone. At oral argument, this Court expressed its dismay and displeasure over the fact that an inmate's personal property can go missing in the NCDPS system without someone being held accountable for the missing property.

However, Plaintiffs have not produced evidence that any of the <u>named individual Defendants</u> – either the Defendant Guards or the Supervisory Defendants – ever personally possessed Devonte's personal property. Since Defendants were never personally in possession of Devonte's property, Defendants could not have intentionally dispossessed Devonte of his personal property.

At best, Plaintiffs might be able to show that NCDPS (as an entity) negligently misplaced Devonte's personal property. However, "[a]s a general rule, a principal will be liable for its agent's wrongful act under the doctrine of respondeat superior when the agent's act is (1) expressly authorized by the principal; (2) committed within the scope of the agent's employment and in furtherance of the principal's business – when the act comes within his implied authority; or (3) ratified by the principal." <u>B.B. Walker Co. v. Burns Int'l Sec. Servs., Inc.</u>, 108 N.C. App. 562, 565 (1993). Here, Plaintiffs have not presented evidence that (1) NCDPS authorized the misplacement or destruction of Devonte's personal property; (2) NCDPS is in the business of misplacing or destroying inmates' personal property; or (3) that NCDPS ratified the decision to misplace or destroy Devonte's personal property. Therefore, even NCDPS cannot be liable for conversion.

In sum, for the reasons stated herein, the Court will grant summary judgment to Defendants as to Plaintiffs' conversion claim.

29

### c. Plaintiffs' Claim for Obstruction of Justice

Under North Carolina common law, obstruction of justice is an offense which "'prevents, obstructs, impedes or hinders public or legal justice.'" In re Kivett, 309 N.C. 635, 670 (1983); Jackson v. Blue Dolphin Commc'ns of N. Carolina, L.L.C., 226 F. Supp. 2d 785, 794 (W.D.N.C. 2002). In support of their obstruction of justice claim, Plaintiffs contend that Defendants were, at all relevant times, aware that the Plaintiffs needed the hospital logs to correctly identify the proper Defendants who committed constitutional violations against Devonte. Plaintiffs note correctly that Defendants' summary judgment motion is based, in part, on Defendants' argument that Plaintiffs have not tied specific guards to specific actions forming the basis for Plaintiffs' claims. According to Plaintiffs, this difficulty stems from Defendants' own obstruction in failing to turn over documents that Plaintiffs needed to identify the individual guards.

Plaintiffs note that on September 13, 2018 (four days after Devonte's death), counsel for the Defendants emailed Plaintiffs' counsel informing him that NCDPS would not voluntarily provide the names of any of the guards in Devonte's hospital room. Moreover, in discovery, Defendants admitted that there are no hospital logs for July 11th, August 6th, and August 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, and 27th.

Plaintiffs argue that Defendants knew that the crux of Plaintiffs' Section 1983 claims stemmed from the actions of these specific guards on the above-described days and were aware of the preservation letter previously mentioned (while Devonte was alive in his hospital bed). Plaintiffs argue that Defendants inexplicably lost all of the above records, preventing Plaintiffs from being able to prosecute all of their claims. Plaintiffs argue that, to date NCDPS has provided no factual reason/rationale for the missing pages. Plaintiffs argue that various Defendants admitted that hospital logs were kept in a binder all together, so there would be no

30

explanation for why certain dates were lost. (See Ex. I, Salas (Dep. 59:14-25); Ex. B, Royal (Dep. 44:2-12); Ex. E, Ward (Dep. 62:2-15); Ex. F, Oliver (Dep. 33:2-25; 34:2-9); and Ex. G Burt (Dep. 24:2-12)). Plaintiffs further note that Defendants have admitted that these documents were significant, as the Warden of Central Prison stated:

> They were record-keeping. It's very significant as far as it's just like any other record-keeping device. If anything was to come to question, you know, it would be a research to try to find out information, and that was one of the ways you could find out or try to find out information . . .

(Ex. J, Thomas Dep. 23:12–20).

It appears that the parties agree that certain documents went missing during discovery, including hospital records during the time that Devonte was hospitalized. These records would have shown which guards were watching Devonte on various shifts. As the Court noted at oral argument, this is very troubling. However, in response to the summary judgment motion, Plaintiffs have not identified any of the named Defendants who may have been responsible for maintaining and/or producing those documents. Without identifying the individual Defendants, Plaintiffs have failed to show that any individual Defendant acted intentionally (as opposed to mere negligence). Without proof of identity or intent, Plaintiff cannot satisfy the requirements of this claim for obstruction of justice. Moreover, as the Court has already noted, NCDPS enjoys sovereign immunity from liability for this intentional tort.[14]

### d. Plaintiff's Claim for Intentional Infliction of Emotional Distress

"The elements of intentional infliction of emotional distress are (1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress."

---

[14] The Court is deeply troubled by the fact of these missing documents. While the Court would like to allow this claim to go forward, its hands are tied.

Denning-Boyles v. WCES, Inc., 123 N.C. App. 409, 412 (1996). "Conduct is extreme and outrageous when it is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Smith–Price v. Charter Behavioral Health Sys., 164 N.C. App. 349, 354 (2004).

First, as to the supervisory Defendants, they never personally supervised Devonte, nor did they ever possess Devonte's personal property. Therefore, given their lack of personal involvement, their conduct could not be extreme and outrageous. In response to the summary judgment motion, Plaintiffs failed to address Defendants' argument that the Supervisory Defendants were not personally involved and therefore cannot be held liable for intentional infliction of emotional distress. Thus, Plaintiffs have abandoned that argument.

Regarding the individual Defendant Guards, they are entitled to summary judgment on the emotional distress claims. They were essentially following NCDPS policy, which was not unconstitutional. It follows that their conduct was not extreme and outrageous.[15] Furthermore, for the remainder of the allegations (blaring the television at times, making Devonte's restraints too tight at times), these do not amount to extreme and outrageous conduct. Regarding the volume of the television, other courts have held that loud music or noises depriving an individual from sleep is not extreme and outrageous. See, e.g., Katz v. City of N.Y., Dep't of Transp., No. 94 Civ. 8319, 1996 WL 599668, at *11 (S.D.N.Y. Oct. 17, 1996) (loud music); Marfork Coal Co. v. Smith, No. 5:10cv69, 2011 WL 744727, at *4 (S.D. W.Va. Feb. 23, 2011) (loud noises and bright lights). In sum, the conduct of Defendants as alleged simply does not rise to the level

---

[15] To the extent that Plaintiffs claim that Defendants' denial of Devonte's request for an early medical release is the basis for their emotional distress claims, Defendants were not responsible for denying Devonte's early medical release.

of extreme and outrageous behavior.[16] Cf. Dickens v. Puryear, 302 N.C. 437, 439, 454–55 (1981) (finding alleged conduct extreme and outrageous when defendants pointed pistol between plaintiff's eyes, beat him into semi-consciousness with nightsticks, and threatened him with castration); Brown v. Burlington Indus., Inc., 93 N.C. App. 431, 432, 435–36 (1989) (finding alleged conduct extreme and outrageous when employee's supervisor made sexually explicit remarks and gestures two to three times a week over an extended period of time); and Hogan v. Forsyth Country Club Co., 79 N.C. App. 483, 490, 492–93 (1986) (finding alleged conduct extreme and outrageous when supervisor engaged in unwanted sexual touching of plaintiff, screamed profanities at her when she refused his advances, threatened her with bodily injury, and pulled a knife on her); with Hogan, 79 N.C. App. at 493–94 (finding conduct not extreme or outrageous when co-employee screamed and shouted at plaintiff, called her names, and threw menus at her).

### e.  Plaintiffs' Claim under the North Carolina Constitution

"[A] direct cause of action under the State Constitution is permitted only 'in the absence of an adequate state remedy.'" Hawkins v. State, 117 N.C. App. 615, 629 (1995) (quoting Corum v. Univ. of N.C., 330 N.C. 761, 782 (1992)). Here, Plaintiffs do not dispute that they have a pending claim with the Industrial Commission, which means that this claim must be dismissed because they have an adequate remedy under state law. See Taylor v. Wake Cnty., 258 N.C. App. 178, 191 (2018). In any event, as to the individual Defendants, the North Carolina Supreme Court has held that a plaintiff cannot maintain a claim against government employees in their

---

[16] Because the Court finds that the conduct was not extreme and outrageous, the Court does not consider Defendants' contention that the Colemans have not presented evidence that they suffered severe emotional distress as a result of watching Devonte suffer.

individual capacities for alleged violations of state constitutional rights." <u>Hawkins</u>, 117 N.C. App. at 630. Thus, Plaintiffs' state constitutional claims against the individual Defendants are dismissed.

### f.  Public Official Immunity

As noted, Defendants have raised public official immunity as a defense to Plaintiffs' state law claims. The Court finds that Plaintiffs' claims against the individual Defendants are also barred by public official immunity. "[A] public official is immune from suit unless the challenged action was (1) outside the scope of official authority, (2) done with malice, or (3) corrupt." <u>Wilcox v. City of Asheville</u>, 222 N.C. App. 285, 288 (2012), <u>appeal dismissed</u>, <u>review denied</u>, 336 N.C. 574 (2013). "[E]lementally, a malicious act is an act (1) done wantonly, (2) contrary to the actor's duty, and (3) intended to be injurious to another." <u>Id.</u> at 289. It is undisputed that a prison correctional officer has public official immunity. <u>See</u> <u>Baker v. Smith</u>, 224 N.C. App. 423, 427–30 (2012) (holding that deputy sheriffs, assistant jailers, and prison correctional officers have public official immunity).

Here, Plaintiffs have produced no evidence that Defendants acted maliciously or corruptly in this case. As for the Supervisory Defendants, because they did not personally supervise Devonte, did not personally handle his personal property, most of them were not involved in the creation or implementation of policy, and Defendant Lassiter's policies were reasonably related to legitimate penological purposes, Plaintiffs cannot show that the Supervisory Defendants acted with malice.

For the Defendant Guards, the vast majority of the allegations against them relate to them complying with NCDPS policies to constantly guard hospitalized inmates, restrain hospitalized inmates to the bed, deny contact visits, and deny outside exercise. Therefore, if they were

complying with NCDPS policy, the guards could not have been malicious in performing those duties. For the remainder of the allegations, Plaintiffs have put forth no evidence other than their conclusory allegations that the guards acted with malice. Indeed, in response to Defendants' summary judgment motion, the only evidence Plaintiffs provide of malicious or corrupt behavior is that when asked whether Devonte's family was treated with dignity and respect by staff, Defendants Salas responded, "probably not [by] all[.]" (Pls. Ex. I, Salas Dep. 69:8). This statement did not identify which Defendant allegedly did not treat Devonte or his family with dignity or respect. Furthermore, Plaintiffs have failed to cite to any cases showing that treating someone without dignity or respect rises to the level of malice. Evidence of malice "must be sufficient by virtue of its reasonableness, not by mere supposition. It must be factual, not hypothetical, supported by fact, not by surmise." Fullwood v. Barnes, 250 N.C. App. 31, 38 (2016). Simply put, Plaintiffs have failed to forecast evidence of malice or corruption. Thus, the individual Defendants are alternatively entitled to public official immunity as to Plaintiffs' tort claims.

## IV. CONCLUSION

In sum, for the reasons stated herein, Defendants' summary judgment motion is granted, and all of Plaintiffs' claims against all Defendants are hereby dismissed.

**IT IS, THEREFORE, ORDERED** that:

(1) Defendants' Motion for Summary Judgment (Doc. No. 65) is **GRANTED**.

(2) The Clerk is respectfully instructed to terminate this action.

Signed: August 24, 2023

35

Max O. Cogburn Jr.
United States District Judge